

# COMMONWEALTH OF MASSACHUSETTS
## Office of Consumer Affairs and Business Regulation
### DIVISION OF INSURANCE
One South Station • Boston, MA 02110-2208
617-521-7794• FAX (617) 521-7475
Springfield Office (413) 785-5526
TTY/TDD (617) 521-7490
http://www.state.ma.us/doi

 SEP 1 7 2004

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**BETH LINDSTROM**
DIRECTOR, CONSUMER AFFAIRS
AND BUSINESS REGULATION

**JULIANNE M. BOWLER**
COMMISSIONER OF INSURANCE

September 15, 2004

METROPOLITAN LIFE INSURANCE COMPANY
Attn: Gary Beller, Sr.
One Madison Avenue
New York, NY 10010

Dear Mr. Beller:

Enclosed please find legal process served upon the Commissioner of Insurance as attorney for a foreign company as provided for in Massachusetts General Laws, c. 175, §154 and §151(3).

Sincerely,

Stacy Siegan
Administrative Assistant
Legal Division

Enclosure(s)



# ROSENFELD & RAFIK
### A PROFESSIONAL CORPORATION

44 SCHOOL STREET
SUITE 410
BOSTON, MASSACHUSETTS 02108

S. STEPHEN ROSENFELD
MALA M. RAFIK

OF COUNSEL
RICHARD AMES

TEL. (617) 723-7470
FAX (617) 227-2843
HTTP://WWW.ROSENFELD.COM

March 24, 2004

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Robert Benmosche
President and Chief Executive Officer
MetLife Life Insurance Company
Metropolitan Life Insurance Company
One Madison Avenue
New York, NY 10010

Jay Purves
Disability Claims Specialist
Disability Income Claims
MetLife
PO Box 30429
Tampa, FL 33630-3429

| | |
|---|---|
| *Re:* | *George Nanis* |
| *Policy No.* | *15-6086664* |
| *Social Security No.* | *016-486-814* |

Dear Mr. Purves and Mr. Benmosche:

This firm represents George Nanis in his claim for long-term disability ("LTD") benefits under his Lincoln National Disability Income Insurance ("Lincoln National") individual disability Policy ("Policy") currently administered by Metropolitan Life Insurance Company ("MetLife"). I am writing this letter to satisfy the requirements of M.G.L. c. 93A, §9, requiring that a demand letter precede initiation of litigation under the Massachusetts Consumer Protection Act. It is our belief that MetLife's refusal to grant Mr. Nanis his requested LTD benefits constitutes a violation of the Consumer Protection Act, M.G.L. §93A ("93A") and M.G.L. 176D, the unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Act ("176D"). Mr. Nanis' claims are more fully set forth below.

## I.    INTRODUCTION

In April 1992, George Nanis opened the Submarina, a pizza and sub shop in West

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 2

Brookfield, Massachusetts. Mr. Nanis had always aspired to own his own business. He had previously worked at Investors Diversified Services (IDS) in Auburn, Massachusetts where he held a position as financial advisor from 1979 to 1985. Mr. Nanis changed jobs in 1986, when he began working at Converse Associates under American General in Worcester, Massachusetts. He worked at Converse Associates as a financial planner until 1988. Mr. Nanis then worked at Lincoln Financial Services in Worcester. Following Lincoln Financial, Mr. Nanis decided to fulfill his goal of owning his own business by opening the Submarina.

Initially, Mr. Nanis worked with a partner at the Submarina. He eventually bought his partner out in 1994, and became the sole owner of the Submarina. At first, Mr. Nanis worked independently, but later hired part-time employees to work with him, as the demands and the clientele of the Submarina increased. Mr. Nanis served as owner operator of the Submarina, which meant he chiefly prepared all of the food. Mr. Nanis worked in these roles full time, often working 90 hours in one week.

In 1999, Mr. Nanis began to feel pain in his elbows. Despite this initial pain, Mr. Nanis continued working long hours. The pain persisted into April of 2002, when he was advised to see a doctor regarding his condition. In September 2002, Mr. Nanis was diagnosed by Dr. Jeffrey Jones, his primary care physician, with lateral Epicondylitis and medial Epicondylitis of both elbows. Lateral Epicondylitis is commonly known as tennis elbow where medial Epicondylitis is commonly referred to as golfer's elbow. Epicondylitis is caused by repeated twisting, wrist, or forearm movements done during every day activity. Epicondylitis causes pain generally in the dominant arm and can spread to the hand, other parts of the arm, shoulder or neck.

Epicondylitis rendered Mr. Nanis unable to perform his daily, required duties at the Submarina. These tasks included loading and delivering supplies, lifting heavy food and equipment, cutting, chopping, and preparing food. Dr. Jones prescribed Mr. Nanis anti-inflammatory medication and advised him to take time off from work to rest. When this treatment failed, Mr. Nanis was referred to orthopedics where he received steroid injections. Unfortunately, this treatment failed to provide Mr. Nanis with more than a little relief. As a result, Mr. Nanis also sought relief through physical therapy. This treatment provided only temporary relief from the pain he experienced.

Since the Submarina was the basis of Mr. Nanis' livelihood, he continued working despite his pain. Mr. Nanis' financial stability was related directly to the success of the success of the Submarina. Mr. Nanis also could not avoid using his hands at work because every aspect of his pizza and sub shop business entailed physical, hands-on activity. When Mr. Nanis' pain became progressively worse, and Dr. Jones recommended that he decrease his hands-on duties in the shop. Instead, Mr. Nanis answered the phone and took orders from customers. As a result of his decrease in duties, Mr. Nanis was forced to hire more employees to perform the duties he could no longer manage to do because of his pain. Unfortunately, more employees meant that

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 3

Mr. Nanis was unable to bring in the same income that he and his family relied upon. This also meant that Mr. Nanis could not continue with his principal duties at the Submarina.

In December 2002, Mr. Nanis filed his claim for benefits under his Policy. MetLife denied Mr. Nanis benefits in June 2003, after determining that Mr. Nanis was able to perform the main duties of his occupation. In September 2003, Mr. Nanis relinquished control of the Submarina.

Information supporting Mr. Nanis' claim for LTD benefits is as follows:

- George Nanis' Affidavit (**Exhibit A**);

- Dr. Jeffrey Jones Physician Profile (**Exhibit B**);

- Dr. Jones Medical Records (**Exhibit C**);

- Medical Information on Epicondylitis (**Exhibit D**);

- Dr. David Doctor Physician Profile (**Exhibit E**);

- Dr. Doctor Medical Records (**Exhibit F**);

- Kevin Smith Physical Medical Records (**Exhibit G**);

- Affidavit of Jim Koutoulas (**Exhibit H**);

- Affidavit of Amy Paquette (**Exhibit I**);

- Affidavit of Tracy Waz (**Exhibit J**);

- Affidavit of Gladys Mountain (**Exhibit K**);

- Affidavit of Thomas Griffen (**Exhibit L**);

- Affidavit of Kenneth Rusiecki (**Exhibit M**);

- Affidavit of James Nelson (**Exhibit N**);

- Affidavit of Kally Judycki (**Exhibit O**);

- Dr. Vilaire Bayard Jr. Physician Profile (**Exhibit P**);

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 4

- Affidavit of Dr. Vilaire Bayard Jr. **(Exhibit Q);**

- Affidavit of James Rivernider **(Exhibit R);**

- Affidavit of Richard Beland **(Exhibit S);**

- Affidavit of Luanne Montague **(Exhibit T);**

- Affidavit of Geraldine Bergeron **(Exhibit U);**

- Affidavit of Jesse Brooks **(Exhibit V);**

- Affidavit of Ryan Clark Leland **(Exhibit W);**

- Affidavit of James Boos **(Exhibit X);**

- Affidavit of Sean Connon **(Exhibit Y);**

- Affidavit of Joyce Coll **(Exhibit Z);**

- Affidavit of Sean and Kim Stull **(Exhibit AA);**

- Affidavit of Leonore Bona **(Exhibit BB);**

- Mr. Nanis' MetLife Long Term Disability Policy **(Exhibit CC);**

- MetLife's June 30, 2003 Denial Letter **(Exhibit DD); and**

- Dr. Jones January 23, 2004 Letter **(Exhibit EE).**

## II.    FACTS

### A.    Onset of Mr. Nanis' Symptoms and Diagnosis

In 1999, Mr. Nanis began to feel pain in his elbows. This pain increased and was noticeably extreme in the spring of 2002. This pain was exacerbated by the daily demands of his job at the Submarina. These included lifting heavy items, preparing food, slicing, chopping, and handling heavy equipment. Mr. Nanis was the principal operator of all activity in the Submarina. While he did have one or two employees helping him at different times of the day, Mr. Nanis was primarily responsible for the aforementioned tasks, as he opened and closed his shop and

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 5

prepared all of the food. Mr. Nanis took great ownership in the Submarina's work product, and despite his pain, he maintained long hours and continued with his rigorous routine. (**See Exhibit A.**)

In August, 2002, Mr. Nanis saw Dr. Jones, Mr. Nanis' primary care physician, regarding his elbow pain. (**See Exhibit B.**) At that time, Dr. Jones diagnosed Mr. Nanis with lateral Epicondylitis, which is more commonly referred to as tennis elbow. Mr. Nanis was subsequently diagnosed with medial Epicondylitis, or golfer's elbow. (**See Exhibit C.**) Dr. Jones advised Mr. Nanis to take two weeks off from work, however, Mr. Nanis was not able to adhere to Dr. Jones's advice as he could not leave the Submarina for longer than one week.

Mr. Nanis relates his initial diagnosis of Epicondylitis in his affidavit dated January 11, 2003:

> I saw Dr. Jones towards the end of the summer of 2002. He diagnosed me at that time with tennis elbow. He seemed very concerned by my diagnosis, more concerned than he had been in the past with my other conditions, which surprised me. Despite Mr. Jones's concern, I did not think it was as serious as he thought. He told me I had to take time off form work immediately. I took four or five days off even though he had advised two weeks. During this time, I had about five or six employees who ran the shop while I was away. Due to my condition, I was forced to hire more employees than was customary at my shop. However, even though I had employees running the Submarina, I was still actively present at the shop and helped with the tasks I could physically perform.

(**See Exhibit A.**)

In September, 2002 Mr. Nanis hired additional employees to work at the Submarina in order to compensate for his absence. He gradually had the employees perform all of his labor-intensive duties since he was physically unable to perform them himself. Mr. Nanis, however, maintained a presence in the shop and oversaw all productions.

B.    **Medical Information On Lateral Epicondyilitis (Tennis Elbow)And Medial Epicondylitis (Golfer's Elbow).**

Lateral Epicondylitis or tennis elbow is a condition where the outer (lateral) part of the elbow becomes painful and tender. Medial Epicondylitis or golfer's elbow is when the inner (medial) part of the elbow becomes painful and tender. These conditions are typically due to

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 6

damage in the tendon fibers which connect the muscle to the bone at or around the outside of the elbow.



## Tennis Elbow Anatomy

1. Symptoms of Epicondyilitis:

   - Elbow pain that gradually worsens
   - Weakness in the wrist; weak grasp
   - Pain in the outside of the elbow when the hand is extended at the wrist against resistance
   - Pain on the outside of the elbow when trying to straighten the fingers against resistance; tender to touch
   - Pain when pressing in on the bony bit on the outside of the elbow
   - Increase in pain in the evening and difficulty sleeping
   - Stiffness in elbow in the morning
   - Pain with mild activities i.e. lifting a coffee cup, turning a jar lid, doorknob, shaking hands

2. Causes of Epicondylitis:

   - Overuse of arm muscles attached to the bone at the elbow
   - Repetitive twisting of the wrist or forearm
   - Inflammation caused by injury or bang
   - Direct injury or strain
   - Torn arm muscles

3. Diagnosis of Epicondylitis:

   - Doctor tests for tenderness in the area near the bony bump on the outside of the elbow
   - Doctor tests to see if pain increases when the wrist is extended back
   - Doctor assessment of daily activities and past injuries

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 7

- X-ray, magnetic resonance imaging (MRI), arthrography, bone scan (however, not common)

4.   Risk Factors of Epicondylitis:

- Activities that involve repeated movements of the forearm, wrist and fingers
- Activities with grasping and twisting arm movements
  - Sports: racquet sports, throwing sports, swimming, golf
  - Workplace: carpentry, plumbing, or working on an assembly line
  - Daily activities: lifting objects or gardening
- Improper techniques when doing certain movements
- Age: most common in the ages between 40 and 60 years old
- History of tendon injuries

5.   Complications of Epicondylitis:

- Recurrence of the injury with overuse
- Rupture of the tendon with repeated steroid injections
- Failure to improve with non-operative or operative treatment

6.   Treatment for Epicondylitis:

- Resting arm to allow tendon to heal
- Pain-relief medication
- Rehabilitation programs/exercises
- Cortisone treatment
- Surgery

(<u>See</u> **Exhibit D**.)

C.   **Increase In Mr. Nanis' Symptoms And Treatment**

Mr. Nanis continued seeing Dr. Jones for his Epicondylitis on a bi-monthly basis. Dr. Jones instructed Mr. Nanis to maintain limited activity in his daily functions. Mr. Nanis, through the instruction of Dr. Jones, also tried other means of alleviating his pain. He was administered steroid injections by orthopedic surgeon Dr. David Doctor (<u>See</u> **Exhibit E**) of Mary Lane Hospital. These injections, however, did little to improve Mr. Nanis' condition. (<u>See</u> **Exhibit F**.)

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 8

In February, 2003, Mr. Nanis began seeing Kevin Smith of Mary Lane Hospital for occupational therapy. (See Exhibit G.) This treatment provided Mr. Nanis with immediate relief of his pain. However, the pain would return after a few days. In addition, Dr. Jones prescribed Mr. Nanis anti-inflammatory drugs and instructed Mr. Nanis on exercises to strengthen his arm and alleviate his pain.

### D.     The Demands Of Mr. Nanis' Duties At The Submarina And The Exacerbation Of His Symptoms

Mr. Nanis' duties at the Submarina were almost entirely labor-intensive. Mr. Nanis used his hands continuously from the time he commenced work in the morning, to the time he closed his shop at night. These duties included lifting heavy food items bought in bulk, storing those food items, operating heavy kitchen machinery, constant chopping and cutting of food items, lifting heavy bowls of dough and water, slicing pizzas, and kneading dough. These duties were typical of a pizza shop owner, but were even more demanding for Mr. Nanis, who lacked the help of a partner.

A fellow pizza shop owner and friend, Jim Koutoulas, testified to the demands of the pizza business in his January 31, 2004 affidavit:

> Professionally, I am in the pizza business. I currently own a business together with my brother and both of my parents. I work about 60 to 70 hours per week and I am involved in all aspects of the business from preparing dough, all the forms of prep, cooking pizzas and serving them, cleaning and paperwork.

> Prior to my current partnership, I owned 2 other pizza businesses but with out the help of partners such as parents and brother. I worked 6 to 7 days per week in these businesses, close to 90 hours per week. During that time, I was forced to put off hip replacement surgery because of my business responsibilities. No doubt that the long hours on my feet contributed to the degeneration of my hip.

> I have no doubt that George's work responsibilities and hours were the same that mine were when I had no family partners.

> George Nanis would come by my pizza store, most often on his way to work or on the way home at 10 to 10:30 in the evening. One night in the summer of 2002, George stopped by and noticed that I was holding a gallon of water (in a container that is commonly used in the pizza or baking industries) in an odd way.

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 9

> He asked me if my elbow was bothering me. I told him that I was
> hampered by tennis elbow.
>
> George told me that he had the same elbow problems as I and he
> held the water bucket the same way that I did. At the time I had a
> part time employee who was an ex orthopedic doctor from
> Albania. The employee was giving me advice for my elbow and I
> told George to speak to him. He told us not to get cortisone shots
> and try to avoid the physical work as much as possible.
>
> I am in my early forties and I still suffer from tennis elbow. I also
> know other local pizza workers who have it. There is no doubt that
> the demands of my physical work are the cause of my medical
> condition.
>
> My pain has gotten a lot worse recently. My own doctors have
> advised me that continued work would only result in worsening of
> my tennis elbow.

(See Exhibit H.)

The demands of the Submarina and Mr. Nanis' commitment to fulfilling those demands
were also obvious to his customers. His daily duties were observed by his customers. Amy
Paquette, a customer of the Submarina, described Mr. Nanis' duties in her August 21, 2003
affidavit:

> I have been a customer of George Nanis at his restaurant The
> Submarina for over 10 years and have also considered him a friend
> during this time. During the times I have frequented his restaurant
> I have observed him working in all aspects of running the
> restaurant and working there. His duties included preparation of
> the food, including making the pizza dough, sauce, and shredding
> the cheese all of which were put in large containers and steel
> buckets. I have seen him carrying the trays of pizza dough, and
> buckets of cheese and sauce out to the front of the restaurant when
> needed for his employees who work there. He uses a meat slicer
> daily to cut the meat for the subs. He has carried buckets of ice for
> the soda machine and gallons of oil for the fryilator (sic). He
> unloaded food shipments, which often included heavy cases of
> tomato sauce and tuna and put them on the appropriate shelves. He
> watched the oven and took out pizzas, cut them and put them into

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 10

boxes often on busy Friday nights.

George was involved in all aspects of running his restaurant both the physical labor and the paper work. During the past year or so that I have seen George he has been complaining of pain in his arms, going to see doctors and the pain has continued to worsen over time. Now when I drive by The Submarina his car is hardly ever there. When I see him at the restaurant he is behind the counter taking phone orders and ringing the register, relying on his employees to do the other work needed, no longer able to contribute in a physical way of running his business.

(See Exhibit I.)

Further, Tracy Waz, a customer of Mr. Nanis, also testified to Mr. Nanis' performance at the Submarina in her September 1, 2003 affidavit:

In the first six years in which I knew George I observed him being a very active owner of The Submarina restaurant. He was involved in every aspect of the establishment. George was responsible for most of the daily food preparation. This involved using a manual meat and vegetable slicer (multiple times daily), daily lifting of freshly made dough to put on the counter to be cut (a job which usually took two people), and cutting and stretching the dough for pizzas. George also took the garbage out daily and helped to lift weekly food and supply deliveries in order to stock the shelves.

George was not only involved behind the scenes, but also provided customer service: taking food orders; making food orders; lifting fryalator baskets; lifting pizzas in and out of the oven; carrying large buckets of ice to be put into soda machines; and running the cash register.

George also kept up a large part of the maintenance of this establishment. On different occasions I remember observing George mowing the lawn; washing windows; mopping the floor; and cleaning the bathroom.

To the best that I could observe, George was able to complete 100% of these activities with ease. That is why I was so surprised when not too long ago, George seemed to be quite noticeably

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 11

> absent from The Submarina it was clear that his role as an active
> owner had changed. He was now asking his employees to do much
> of the work that he used to do and seemed to have the limited role
> of taking orders and using the cash register. Even this seemed
> painful for George. In talking with George in the spring of 2003 he
> complained of severe pain in both of his elbows, making physical
> labor nearly impossible. George was clearly upset with the fact
> that he could no longer maintain the level of intensity in which he
> had run the business for so many years and regretted not being an
> active participant in The Submarina. George vocalized being
> extremely frustrated in knowing that there may not be a cure for his
> pain and that he might have to sell the business.

(See Exhibit J.)

Gladys Mountain, a former customer of eight years to the Submarina, described in her
August 28, 2003 affidavit, the financial constraints of running a pizza and sub shop:

> When I first started going there [Submarina], I recall having a
> conversation with George about what a hard job it is to run a Pizza
> Parlor, having done so myself many years ago. I know that the
> margin for profit is slim in that type of business and it is
> counterproductive to hire more staff than is absolutely necessary.
> Lately, I've noticed that George hasn't been there as much and
> there are several more employees than he ever had working there.
> He explained to me that he has had health problems, which have
> interfered greatly with his ability to do the work required of this
> business.
>
> I would like to know that someone who can help put his life back
> together would have the compassion to do so as soon as possible.

(See Exhibit K.)

### E.    Mr. Nanis' Continued Pain At Work After His Diagnosis

From September 2002 to September 2003, Mr. Nanis continued working at the
Submarina, despite his pain, in less hands-intensive roles. These roles, such as speaking with
customers, taking orders, and other administrative tasks, often caused Mr. Nanis pain despite
their less physical nature. Moreover, occasionally, Mr. Nanis was forced to help his employees
with hands on tasks like preparing food, when there were a lot of clients or when the staff was

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 12

low.  As owner and manager, Mr. Nanis was responsible for making sure the Submarina
functioned properly and clients were all taken care of in a timely manner.

An example of Mr. Nanis having to work beyond the amount recommended by his
doctors was depicted in Mr. Nanis' affidavit of January 19, 2004:

> One night, in June of 2003, the Submarina was especially busy.
> One of the girls was sick and I let her go home at 9:00 PM.  One
> other employee was there and we planned on cleaning up the shop
> and going home.  Suddenly, the store became extremely busy and I
> was forced into a real working role for forty-five minutes, a role I
> had not been in for months.  That night I went home and both my
> arms were aching.  My right arm had been worse than my left arm,
> but that night I could not even click a remove from my bed with
> my left arm.

**(See Exhibit A.)**

Despite Mr. Nanis' attempts to mask his condition, his customers were aware of his level
of pain and his attempt to work through that pain.  Another customer of Mr. Nanis, Thomas
Griffen, stated in his affidavit on October 1, 2003:

> My name is Thomas F. Griffen.  I work for the United States Air
> Force at Westover Joint Air Reserve Base in Chicopee Ma.  I've
> been in the military for 18 years.  I have also known George for
> about 6 years.  My family and I live across the street and up the hill
> form George's shop.
>
> Prior to George's condition, he seemed to me to be very active,
> outgoing, very friendly and strong.  He always took care of his
> customers.  If he had a bad day at work he never showed it  We
> first met George in April of 97.  My kids wanted some pizza and
> friends of ours recommended the Sub-Marina (sic).  When we went
> down the hill to his shop I was totally amazed how clean his place
> was.  Not just inside but outside as well.  He and his staff made
> some of the best pizza, subs, chicken I've had in years.  This
> speaks volumes for his work habits.
>
> I didn't know George outside of his business.
>
> George came to my house about 2 months ago.  We sat down, he

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 13

> told my wife and I what was going on with him. That was when I
> figured out why he was not making his food like he used to. I
> noticed 5-6 months prior that he was only at the register or
> suppervising (sic) in the back. I couldn't figure out why, but I did
> not want to ask. *After he told us we could see the pain not only in
> his body but also in his eyes. He sounded very down and out. His
> business seemed to be his whole life and it was being taken away
> because he could not do the job.* (Emphasis added).

> I have seen George 4-5 times after he told us about what was going
> on, and he seems weaker now then I have ever seen him.

> There has been a LARGE impact on my family because George
> had to sell his shop and the best pizza shop in the Brookfields will
> be sold.

(See Exhibit L.)

Also, Kenneth Rusiecki, a customer of Mr. Nanis', testified, in part, to the pain Mr. Nanis
experienced at the Submarina after his diagnosis of Epicondylitis, in his August 30, 2003
affidavit:

> In April of 2002, I was picking up lunch at the restaurant when I
> went inside George was in the back useing (sic) the big mixer to
> make pizza dough. He asked me for help in removing the pot from
> the mixer and moving it because he was afraid he would drop it
> due to the weakness in his arm. George has many times verbally
> expressed his pain and loss of strength in his arms to me.

(See Exhibit M.)

This sentiment was reiterated by James Nelson, a friend and customer of Mr. Nanis in his
affidavit dated September 5, 2003:

> Prior to George's injury I often observed George doing heavy
> manual labor in his store by carrying cases of food and soda. He
> was very willing to help his employees with jobs that needed to be
> done. George seemed to enjoy his job and work in general. He
> always made an effort to say hi and talk to customers.

> He was also very physically active outside of work. I played

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 14

> basketball with him often up until late 2001. I know that he was
> also an avid fisherman.
>
> When George injured himself, he did not do any hard labor at the
> store and he would react in pain when lifting. George appeared to
> become frustrated with his injury and wanted to get back to
> normal. He began to delegate labor to his employees and he
> became more and more frustrated with his limited capabilities.
>
> I have no doubt that his injury and resulting inability to perform the
> physical tasks required of him led to the closing of his business. It
> is obvious to me that George is very frustrated with his situation
> and he wants to be able to do the thing she used to do.

(See Exhibit N.)

### F.    Mr. Nanis' Dedication To The Submarina: His Customers' Perspective

Mr. Nanis was exceedingly dedicated to the Submarina, his employees, and his customers. In his affidavit, Mr. Nanis stated, "I demanded a lot of myself when it came to customer satisfaction. I knew all of my customers by name. If I did not get 100% satisfaction, I was not happy with myself." (See Exhibit A).

On September 2, 2003, Kally Judycki, a customer of Mr. Nanis' stated in a letter:

> I have been a customer of George's at the Submarina in West
> Brookfield for over 10 years.
>
> When I first started going to the Submarina, George was running
> the entire place by himself. He would be making the pizzas and
> subs, answering the phone, talking with customers, yet managed to
> keep the customers flowing in and out. My family grew quite fond
> of George's fish and chips, always choosing Submarina for their
> take-out orders.
>
> In the last few years, I noticed that the staff at the Submarina was
> growing, and the turnover was high. The staff was taking on other
> responsibilities, such as the preparation of subs, pizza and the other
> menu items. I also noticed that George was taking more of a
> supervisory role. George was also not there as much as he was in
> earlier years. My family could usually guess correctly if George

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 15

> was working or not on any particular night we order (sic) from
> there, with the accuracy of the order we received.

(See Exhibit O.)

    Vilaire Bayard Jr., M.D., a general surgeon, provided Mr. Nanis with medical advice
when he frequented the Submarina. (See Exhibit P.) Dr. Bayard, a patron of the Submarina,
further testified to Mr. Nanis' condition in his August 27, 2003, affidavit, stating in relevant part:

> It is a pleasure for me to write this letter on George's behalf. I
> have known George for the past ten years. I distinctly remember
> the first time we met when my late wife and I were house hunting
> from New York City and stopped to have some pizza at the
> Submarina. The pizza was excellent, we ended up buying a house
> in September 1993 in West Brookfield and have been a loyal
> customer ever since.
>
> Our friendship has grown within the years and I have had the
> opportunity not only to talk to him but also observe him at his
> place of business. At first George was present at the Submarina
> seven days a week and had no complaints. I had no idea of how
> physically demanding it was to own a pizzeria/restaurant. It was
> obvious that he worked hard and was dedicated to the success of
> his business.
>
> As a surgeon George trusted my judgment and at times would ask
> for my opinions on some health matters. I became aware of his
> cardiac history, inguinal hernia repair and his lower back problems.
> But about two years ago I have noticed a progressive deterioration
> of his ability to work. This was due to severe case of tendonitis he
> developed in his right medial forearm and later developed the same
> symptoms in his left upper extremity. Treatment consisted of
> multiple modalities. Physical therapy, ultra sound, acupuncture,
> iontophoresis...etc. At times he was immobilized with an arm sling
> and had cortisone steroid injections. There was no relief to his
> discomfort. His upper extremities were further complicated by the
> development of bilateral Golfer's elbow. What I have noticed in
> the past year is an inability for him to work as he did before. I
> don't see him at work often. I noticed he has a lot more employees
> and overall is discourage (sic) about his situation. When I do see
> George he continues to have chronic pains to both upper

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 16

> extremities and continues to undergo rehabilitation. These
> ailments have severely compromised his ability to work.

(See Exhibit Q.)

James Rivernider, also a former customer of the Submarina, described in his August 25,
2003 affidavit how Mr. Nanis would go above and beyond what was required of him as owner,
manager and laborer at the Submarina in order to please his customers, and how his performance
declined with the onset of his condition:

> I have been a customer of George Nanis' Submarina Shop (sic) for
> over ten years. I probably frequented his establishment once or
> twice a week over that time.
>
> For most of this time, George was an active and vital participant in
> all activities of the business. He did much of the preparing of
> orders and serving them. Additionally he often made extra deserts
> (sic) and confections given free to customers as a good will
> gesture. His work schedule over these years was probably six days
> a week. I sometimes remarked to him that the boss should be
> entitled to weekends off. He felt that he should be working to keep
> things going properly. I would describe George as a hardworking
> small business man, running a very demanding business.
>
> About two years ago, it became obvious that George was incapable
> of performing even the most minor activities without pain. George
> often described the medical efforts to give him relief but all were
> no help. I observed his arms bandaged for a period of time but I do
> not know the purpose of this treatment.

(See Exhibit R.)

Mr. Nanis maintained a friendly rapport with all of his customers. His relationship with
his customers extended beyond the Submarina. Richard Beland, owner of a dental lab in West
Brookfield and patron of the Submarina related the importance Mr. Nanis placed on his
customers and his business in his September 3, 2003 affidavit:

> I have noticed a definite change in George's overall health recently.
> I have on a number of occasions seen him wince in pain for no
> apparent reason. When I asked him about it he told me he felt
> pains in his chest and arms.