Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 17

> I am diabetic and I know George is also. He has helped me through the years, providing me with information on the disease. He helped me the most by carefully preparing my meals himself. For quite a while now he has not been able to prepare my meals and I can say I definitely miss this service. I used to really enjoy his cooking and the meals he prepared never caused my blood sugar levels to rise and I check them 3 to 4 times daily. So I asked him if the pains and the lethargy I observed were connected to the disease. George told me he wasn't sure but diabetes can prevent people from recovering from a variety of ailments. I personally suffer from chronic pain in my knees and elbow so I understand that it must be next to impossible for George to do all the things I remember him doing at the shop. When I met him things like making all the meals, taking all the orders, cleaning the place, and making up 200-300 pizza boxes by himself.
>
> Another interest we shared was fishing. I used to enjoy hearing about his trips to New York and other places. It's so sad when a person has to give up some of the things he loves most.
>
> In closing, I'll only say I've seen a big change in a man I've long considered a friend.

(See Exhibit S.)

David and Luanne Montague, another patron of the Submarina, echoed these sentiments in their August 28, 2003 affidavit:

> George is a hands on employer, who likes to be on a first name basis with his customers. When you would go into the shop, you would usually find George behind the counter preparing the various orders that came in; cutting pizzas; cutting pizzas, putting pizzas in the oven or takign them out, or chopping foods for use in salads, sandwhiches (sic), etc.
>
> Lately when we've been to his shop, we've noticed that George isn't as involved with the daily preparation as he used to be. We still see him behind the counter, but it's for taking orders or collecting money from the customers, there is a noticeable absence of physical activity, such as kneeding (sic) of dough or slicing tomatoes. This has become noticeable in the past year.

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 18

(See Exhibit T.)

### F. Mr. Nanis' Condition And Role At The Submarina: His Employees' Perspective

To maintain productivity and keep the Submarina open for business, in or about September 2002, Mr. Nanis was driven to hire more employees. Mr. Nanis' level of pain reached a point where he could no longer serve as principal laborer at the Submarina. Geraldine Bergeron, a former employee of the Submarina, describes her experience working with Mr. Nanis in her letter:

> I Geraldine Bergeron was employed at the Submarina in West Brookfield from 2000-2002.
>
> The job entails a lot of heavy lifting and repetitive tasks. Lifting large vats of dough. Stocking soda and beer coolers. Putting cases of sauces and cheese away. Manually slicing vegetables, meat, cheese, stretching dough for pizza. General cleaning (washing floors, counters, tables, etc.) Maintaining and cleaning equipment. Also maintaining the outside of the building and grounds.
>
> George took an active part in all aspects of the business. Prep work, putting stock away, taking and putting up orders from customers. He worked along side employees.
>
> George did all the managerial duties as well. Staffing, payroll, placing food orders with the distributors.
>
> Towards the end of my employment, George took more time off for doctor appointments and medical tests, which was out of character for him.

(See Exhibit U.)

Mr. Nanis' work ethic and the decline in his ability to work was further emphasized in the affidavit of another former employee of the Submarina, Jesse Brooks, in his August 16, 2003 affidavit:

> Over the years George was a serious worker. He did 90% of the preparation work, such as making dough, cutting dough, stretching pizzas, making pizzas, making subs, stirring sauce, slicing meats

and produce. He was also involved with the landscaping and shoveling snow in the winter time. Three years ago George and I participated in a three on three basketball tournament for a fundraiser for Molly Bish. He was very active. He also would frequently go for walks to stay in shape. George used to work six days a week for at least a twelve hour period a day. About spring time last year I noticed George was having trouble with almost all of the physical labor. He used to work Monday and Tuesday all by himself, but he had to put me on the schedule to help him, then I eventually took over those days with an additional employee.

I know George goes to the doctors quite frequently for different types of physical therapy. Recently he was in a bad car accident, he was struck in his vehicle by a drunk driver. This also caused him a lot of pain and stress. George has also been seeing a cardiologist. Right now George can't do most of his chores, all he can do is answer the phone on Friday nights. He stays on the customer's side of the counter for the majority of the eight to ten hours he puts in a week.

(See Exhibit V.)

Ryan Clark Leland, another former employee of the Submarina, stated in his August 26, 2003 affidavit:

- Mr. Nanis and I often worked together on week and weekend nights.
- Mr. Nanis frequently called me in when an extra hand was needed. I worked with Mr. Nanis in the daytime when I was off from school.
- Typically, Mr. Nanis took Sundays off, but worked the rest of the week (sometimes he took Tuesdays off). He easily put in 40 hours a week.
- He would arrive at about 12 or 12:30pm and stay in West Brookfield until 8pm. On Thursdays, Fridays, and Saturdays, Mr. Nanis consistently would stay until the shop was closed.
- I can recall one Saturday in June 1996 when Mr. Nanis and I worked until 1:15 am! We were constantly bombarded with food orders and we had no time to catch up. By the end of the night, the whole store needed to be cleaned and

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 20

- every food item needed to be "prepped."
- Sometimes after I would leave at night, Mr. Nanis would stay behind and continue to do prep work. When I would drive by the store later on at night, he would still be there (11:00-11:30).
- Mr. Nanis took three to five vacations a year. Some vacations were short and some were up to a week or more.
- Often, I have seen Mr. Nanis work a full day, standing on his feet behind the counter.
- Often, I have seen Mr. Nanis prepare food and slice vegetables and meats.
- Often, I observed Mr. Nanis wipe the tables and mop the floors.
- Often, Mr. Nanis removed the trash and shoveled the front step when there was snow.
- Often, Mr. Nanis lifted bags of flour to make pizza dough and when the dough was mixed and ready to cut, he lifted the mixing bowl (at least 50-70 lbs).
- Often, Mr. Nanis moved and sliced large blocks of cheese for preparation.
- Many times when Mr. Nanis arrived in the morning, I would see him carrying boxes of vegetables and other canned items that he purchased at a market.
- When Mr. Nanis sought to remodel the store, he often pushed and placed the appliances into position.
- I helped Mr. Nanis move large objects (refridgerators (sic), grills, tables, mixing bowls, and boxes) and I have seen him in the middle of a "rush" (busy time around dinner or lunch) handling customers and quickly preparing food.
- Mr. Nanis was well-liked by the Submarina clientele. People often placed their orders with Mr. Nanis to ensure that the order would come out right.
- Mr. Nanis was friendly to his customers and employees. Many times I witnessed him bring large orders of food out to a customer's car.
- Last summer, Mr. Nanis first told me that he might no longer be able to work because of an injury around his elbows and wrists. When I shook his hand, he was in pain.
- I recall Mr. Nanis mentioning his use of pain medication and he told me that he has sough medical treatment from his doctor.

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 21

- I have witnessed Mr. Nanis delegating much more of the work in his store to employees. When I came to visit him one time, he asked me if I could lift a mixing bowl onto the counter because he was no longer able to do it.
- Mr. Nanis told me that he was sad and he might actually have to sell his business and stop working at the Submarina.

(See Exhibit W.)

James Boos, another former employee of the Submarina, stated in his September 2, 2003 affidavit:

> I observed George hustle during busy hours (all the employees hustled) but George needed to maintain order as well as food preparation. Many times, Mr. Nanis would leave us to take care of customer relations while he would tend to the other duties of the restaurant. In short, George was a very hard worker and dedicated to his business and still is today as far as I can tell.

(See Exhibit X.)

Sean Connon, who delivered food to the Submarina, recognized Mr. Nanis' inability to lift heavy objects and helped him when possible. He testified in his August 29, 2003 affidavit:

> I deliver for T&R Wholesale. I have been delivering here for 1 ½ years. The entire time I have delivered I have had to put all items of various weights away because he is unable to life any thing with his hands.

(See Exhibit Y.)

Mr. Nanis further stated in his affidavit:

> When I became ill, I still managed, at least initially, to get the job done. I felt like I was a machine in that store. No matter how broken I was, I still had to perform. Most of all, I did not want my customers to be unhappy. Even if I had one unhappy customer and one hundred happy customers, I was not satisfied.

(See Exhibit A.)

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 22

G.     Mr. Nanis' Inability to Perform Daily Functions of Life

Since the onset of his condition, Mr. Nanis' ability to perform simple daily tasks has decreased. His suffering was obvious to his family, friends, and neighbors. The change in Mr. Nanis' lifestyle was dramatic, as he was unable to do activities he had once enjoyed, as well as chores and daily life functions he was accustomed to and took advantage of having the ability of doing each day. The following testaments also identify the extreme nature of Mr. Nanis' condition.

Mr. Nanis' wife, Joyce Coll, witnessed this decline in her husband's health and spirit from the time he was diagnosed to the present. She related in her September 22, 2003 affidavit letter:

> When I first met George, I was impressed by his enthusiasm, energy, and drive. He was a very physically active man who enjoyed playing basketball. He had dreams of owning his own restaurant, which he fulfilled in April of 1992 when he opened his pizza store, The Submarina, in West Brookfield Massachusetts.
>
> George made a success of the restaurant through hard physical work, at least 60 hours per week, usually 6 days per week. He enjoyed the physical work, however, and he took great pride in providing top quality food to his customers. This "hands on" work that George performed was vitally important to the business because, without his labor, the store could not make a profit.
>
> George is an extremely stoic man who is hesitant to complain when he is in pain. He took exactly one week off after having a hernia operation in the mid '90s and he even worked for several days in a row while standing on a severely sprained ankle. A doctor had to insist that he take time off to rest his ankle.
>
> Due to his stoic nature, I was at first unaware of how much George was suffering from persistent and increasing pain due to the chronic inflammation in both of his arms. He continued to work and hope that he would wake up one day and the pain would just go away. I did notice that George was becoming increasingly withdrawn.
>
> Finally, after several months of working in pain, George confided in me. He was worried that he would no longer be able to keep the

business that had been his livelihood for over 10 years. The pain was keeping him up at night. He admitted that (sic) could not even turn the pages of a magazine without pain.

George did not want to accept that he was no longer able to perform the physical duties of his job, which involved lifting food supplies, prep work/slicing of cheese and vegetables, mixing and cutting pizza dough, lifting racks of dough balls, opening the raw dough with his hands to form pizzas in the pans, cooking pizzas, removing them from the oven, cutting pizzas with a large knife, preparing sub sandwiches, lifting fryolator baskets full of fish or french fries, scrubbing the grill and pans, mopping the floors, etc. I understand the physical aspects of this work because I worked along side of George when he first opened the store.

George sought out medical treatments for his condition. He consulted with Dr. Jeffrey Jones in September of 2002 and George was finally diagnosed with severe tennis and golfer's elbow in both arms. Dr. Jones referred George to an orthopedic surgeon, Dr. David Doctor, who gave him cortisone shot(sic), which did not help the pain. Dr. Doctor sent George to an occupational therapist, Kevin Smith, who administered physical therapy over the course of several months.

Dr. Jones told George that he needed to stop performing the physical labors of his job. He asked George if he had a disability insurance policy, and when informed that he did, he recommended that George apply for his benefits. George was initially hesitant to apply, he was still hoping that his condition would improve.

George ceased performing the physical labors of his job in September of 2002. The only work that George did at the store after that point was answering the telephone and ringing the cash register. He was forced to pay his employees to do the physical work that he used to do himself. Since he was paying others to do his work, the store was no longer able to turn a profit. In November of 2002, George reluctantly filed for his disability benefits. Unfortunately, neither ceasing physical labor nor medical treatments have improved his condition.

George has been very saddened by his disability and he feels like

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 24

>he is a burden to me in our marriage due to his inability to perform simple household tasks that he used to do before, such as taking out the garbage or carrying a bag of groceries. He is unable to mow the lawn, trim the hedges, rake leaves, and operate our snow blower.
>
>Our current tenant Sean Stull, has been very supportive by taking over the lawn mowing duties this year. While it makes George feel better if he does not have to see me doing all of the physical tasks, we cannot depend on Sean (or future tenants) to help all of the time. Several times last winter George had to watch me struggle with the snow blower and I could see that it was very upsetting to him.
>
>I can clearly see George's suffering every day due to the pain in his arms and hands when he has to do simple things that a healthy person takes for granted, like drinking a glass of water. He winces in pain.
>
>George can no longer participate in the leisure activities like fishing that had given him pleasure. I have had to adapt my lifestyle to fit his physical limitations and I have much less time and energy for my own leisure activities due to the time I have to spend performing the household tasks that George used to do.
>
>Earlier this month, mounting debts finally forced the closing of the pizza store. This has caused George to suffer more since he has lost the business that he took such pride in operating successfully for so many years.

(See Exhibit Z.)

Sean and Kim Stull, tenants of the Nanises for five years, described their perception of Mr. Nanis' physical decline in their September 8, 2003 affidavit:

>As winter approached our first year, the driveway was always clear of snow and salted for any ice. In the spring, the lawn was well kept and mowed.
>
>In August 2000, we brought home a yellow lab puppy at 8 weeks old. Although George was allergic to dogs, he immediately

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 25

bonded with Mackenzie as if she were his dog. He would take her on nightly walks at least 3 to 4 times a week. He would also take her to family outings with his nieces and nephews. Several times, George was kind enough to take care of her and walk her when we had plans that would keep us out for the day. We always have an open door policy. If George wanted to take hr during the day when we were at work, he would. This was very reassuring with Sean and I both leaving early in the morning for work.

Things started to change over the last 2 years. George was no longer able to take Mackenzie for walks. She was too strong and was pulling too hard.

My husband and I noticed last spring that the lawn was getting high and needed to be mowed. We were always more than willing to pitch in when we were home, so Sean began mowing the lawn, trimming bushes and weeding. After learning of the problems George was having and the pain he was in, Sean took on the weekly chore of mowing the lawn. As winter approached, my husband needed to assume the duty of shoveling and snow blowing the driveway and walkway when he got home from work. This past winter, the hot water tank broke. Sean accompanied George to Home Depot in case he had to lift anything out of the truck. When they got home, Sean ended up having to carry the tank down to the basement by himself because only the 2 of them were home. Obviously, that is an enormous undertaking for one man to achieve by himself. But in the middle of the winter with no hot water, he had no choice.

This past weekend, my husband and I were surprised to see George at home on a Friday night. He informed us that he had closed his restaurant.

George is very appreciate to us for the things that we do. It is obvious that it disturbs him a great deal to rely on his tenants to perform tasks that he used to do with ease. Though we are happy to help, it is unfortunate to see George suffer.

(See Exhibit AA)

Leonore Bona, a neighbor of Mr. Nanis' mother, noticed Mr. Nanis' absence from his

mother's home as his condition deteriorated. Mr. Nanis would frequent his mother's home to help her with errands, chores around the home, and outdoor maintenance. As Ms. Bona testified in her September 14, 2003 affidavit:

> I have known George Nanis for approximately 6 years, since moving into his mother's 2nd floor apartment.
>
> George is a big man, over six feet tall. He has been involved in the care and upkeep of his mother's property since I have lived there.
>
> In the late spring of 2002, it was obvious that Mrs. Nanis' six foot high hedges were not being trimmed as they always were by George. They looked ragged and sloppy. When I inquired, Mrs. Nanis informed me that George had been injured and was unable to do the work. She finally had to hire someone in both the spring and fall of 2002 and 2003, at great unexpected cost, to do the work George usually did for free.
>
> Additionally, I have had to take on the responsibility of shoveling out the sidewalks around Mrs. Nanis' (sic) home (corner lot - 3 long sidewalks) after any snowfall since 2002 because George is no longer able to lift a shovel full of snow and can't control a snow blower.
>
> George is very close to his mother, who is in her 70's, and he would not be leaving this work to her if he were able to do it himself.
>
> I've seen George visiting his mother and he has been very depressed. He is often frustrated and talks about his inability to provide for his family, his workers and himself because of his physical weakness.
>
> George's injury and disability has had a negative effect on other besides himself- his mother and me included.

(See Exhibit BB)

III. METLIFE'S POLICY

An examination of Mr. Nanis' Policy reveals a the following definition of disability:

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 27

"Own Occupation Total Disability" means that because of Injury or Sickness:

a. You cannot do the main duties of Your Occupation; and

b. You are under a Physician's Care.

(See Exhibit CC.)

"You" and "Your" refers to the insured named on Page 3. (See Exhibit CC.)

"Occupation" is defined as "the start of Your disability." (See Exhibit CC.)

"Physician's Care" is defined as "treatment by a physician which is appropriate for the condition causing the disability. When in the opinion of the Physician future and continued treatment would be of no benefit to You, then the requirement of being under a Physician's Care will be considered to be met." (See Exhibit CC.)

"Injury" is defined as "an accidental bodily injury that happens while this Policy is in force." (See Exhibit CC.)

IV.   METLIFE'S INTERNAL PROCESS

A.   Mr. Nanis' Application for Benefits and Metlife's Review of Mr. Nanis' Claim

On December 12, 2002, Mr. Nanis applied for LTD benefits under his Policy. Mr. Nanis claimed disability commencing on November 1, 2002 due to his condition of Epicondylitis. On February 7, 2003, Mr. Purves of MetLife contacted Mr. Nanis regarding his claim for total disability. At that time, Mr. Nanis informed Mr. Purves that he was still answering phone calls, taking orders and operating the cash register at the Submarina.

On February 14, 2003, Mr. Nanis received a letter from Mr. Purves informing Mr. Nanis that his claim would be more appropriate for Residual Disability under the Policy rather than Total Disability, as he was still engaging in some of the duties of his occupation. Mr. Purves further stated in this letter that Mr. Nanis' claim would be re-examined after receipt and review of medical records and financial information.

A subsequent letter was sent by Mr. Purves to Mr. Nanis on April 21, 2003, requesting financial information to determine his monthly earnings. Mr. Nanis provided MetLife with all of the documents requested by MetLife.

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 28

### B. MetLife's Denial of Mr. Nanis' Benefits

On June 30, 2003, six months after Mr. Nanis filed his application for benefits, Mr. Purves wrote Mr. Nanis informing him that MetLife was denying his claim for LTD benefits. The June 30 letter stated in relevant part:

> Further, our evaluation has included review by our consulting board certified orthopedic surgeon and consulting board certified physical medicine and rehabilitation physician. Based upon our review, we find that your condition, epicondylitis, generally, is not a condition that results in functional impairment for the use of the hands and the arms. Furthermore, please note that we have also monitored your activities and you have exhibited the ability to perform the substantial and material duties of Your Occupation without restriction. As such, based on all of the information contained in our file, it appears that you are not suffering from an Injury or Sickness that would impair you from performing the material and substantial duties of your occupation. Therefore, we find that there is no basis to provide benefits at this time.

(See Exhibit DD.)

### C. Request for Claim File

On July 19, 2003, July 28, 2003, September 2, 2003 and October 28, 2003, Rosenfeld & Rafik, Mr. Nanis' counsel, sent written requests to MetLife for Mr. Nanis' claim file. On July 23, 2003, MetLife wrote counsel for Mr. Nanis indicating that it was not MetLife's policy to release such information. Further, on August, 22, 2003, September 17, 2003 and December 19, 2003, Rosenfeld & Rafik received letters from MetLife stating that MetLife was in receipt of the letters requesting Mr. Nanis' claim file and that, after further review of the letters, MetLife would prepare a more detailed response. Most recently, Rosenfeld & Rafik received a letter dated January 15, 2004, explaining that because Mr. Nanis' policy is not governed by ERISA, disclosure requirements do not apply.

## V. APPLICATION OF THE POLICY TERMS TO MR. NANIS' CLAIM

### A. Overview of Policy Terms

As stated above, the Policy requires the following in order to demonstrate Own Occupation Total Disability:

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 29

>   (1) you cannot do the main duties of your occupation; and

>   (2) you are under a Physician's Care.

>   All of the definitions in Your Policy apply to this Rider.

(See Exhibit CC.)

### B.  Mr. Nanis Suffers From an Injury Pursuant to the Terms of the Policy

The Policy defines Injury as "an accidental bodily injury that happens while this Policy is in force." Mr. Nanis suffers from Epicondylitis in both arms, which first manifested itself when his Policy was in force. Mr. Nanis' physician, Dr. Jones, diagnosed Mr. Nanis with Epicondylitis in September, 2002 and has maintained this diagnoses to the present.

### C.  Due to his Injury, Mr. Nanis Is Not Able To Perform The Main Duties Of His Occupation.

#### 1.  Policy Definition

Mr. Nanis' Policy is an "own occupation" policy. As stated above, the Policy defines "own occupation" as follows: "You" and "Your", "refers to the Insured named on Page 3" [George Nanis] and "Occupation" is defined as "the occupation (or occupations, if more than one) in which You are engaged at the start of Your disability."

#### 2.  Evidence of Mr. Nanis' Inability to Perform The Main Duties Of His Occupation As Owner/Manager/Laborer

It is clear from the evidence presented above that Mr. Nanis is unable to engage in the main duties of his occupation. First, as a medical matter, Dr. Jones as confirmed Mr. Nanis' inability to perform the duties of his occupation. Since September 2002, when Dr. Jones first diagnosed Mr. Nanis with Epicondylitis, to the present date, Dr. Jones has tracked the lack of improvement in Mr. Nanis' condition. In particular, Mr. Nanis' condition of Epicondylitis has not improved in over one year despite treatment by Dr. Jones (See Exhibit C), cortisone injections with Dr. Doctor (See Exhibit F), and physical therapy with Mr. Smith. (See Exhibit G.).

In a letter dated January 23, 2004, Dr. Jones stated:

>   George Nanis is a 46 year old who developed pain in both elbows
>   in September 2002. Mr. Nanis owned and operated a pizza shop in

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 30

> West Brookfield and used his wrists repetitively in the conduct of his business. The repetitive use of his wrists and forearm muscles resulted in the condition known as "tennis elbow" or lateral epicondilitis.
>
> The patient was started on the usual treatment which includes rest and antiinflammatories. When the above treatment failed, he was referred to orthopedics where he received steroid injections with little relief. *Despite the above treatments including extended rest, the pain became chronic and as a result he was disabled from performing his duties at the pizza shop and was forced to make a career change eventually selling his business.* (Emphasis added).
>
> The patient continues to experience pain in his elbows and cannot lift any weight without experiencing pain.

(See Exhibit EE.)

Second, Mr. Nanis' inability to perform the duties of his occupation is depicted through the numerous affidavit letters written by customers of the Submarina, employees of the Submarina, friends, family, neighbors, and himself. The letters portray the incredible work ethic and dedication Mr. Nanis applied to every duty he performed at the Submarina and at home. Most importantly, the letters portray Mr. Nanis' physical limitations with even the most minute tasks, and his continued efforts to work through his pain in order to maintain his livelihood. Through these testimonies, Mr. Nanis' pain and suffering is depicted in a manner that is often difficult to capture through a medical examination. In addition, these testimonies depict how difficult it was for Mr. Nanis to close the Submarina, a self-owned business, which he worked hard to open and maintain.

Third, MetLife contends that Mr. Nanis' claim for benefits would be more fit for Residual Disability benefits rather than Total Disability benefits. MetLife based this determination on the fact that Mr. Nanis continued to talk on the phone, take orders, and perform other administrative tasks. While these duties were a part of Mr. Nanis' responsibilities, they certainly did not constitute his main duties. Rather, Mr. Nanis' main duties, as stated previously, included the following:

    a.    Repetitive lifting of heavy food and equipment

            1. Lifting of food items bought in bulk (i.e. 50 lb. bag of flour)
            2. Lifting of cookware (i.e. 60 quart cast iron bowl weighing 35 lbs.)

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 31

    b.    Preparation of food

1. Repetitive chopping/cutting of meats and vegetables
2. Repetitive slicing of meats, vegetables, breads
3. Repetitive slicing of pizzas
4. Kneading/rolling dough
5. Construction of pizza boxes

    c.    Stocking foods (heavy, because mainly bought in bulk)

    d.    Delivery of food/beverage; assistance to delivery persons

1. Loading/unloading of truck
2. Hauling of food/beverages

    e.    Maintenance of outside

1. Shoveling steps/walkway of snow
2. Mowing the lawn

On February 7, 2003, when Mr. Purves contacted Mr. Nanis, Mr. Nanis had ceased performing the main duties of his occupation listed above. Rather, the duties Mr. Nanis performed following his date of disability in November 2002, and prior to the closing of the Submarina in September 2003, were minor managerial and administrative tasks Mr. Nanis performed in order to maintain operations in the Submarina. The aforementioned main duties were performed by the employees Mr. Nanis was forced to hire to keep the Submarina open for business.

Finally, MetLife's determination to deny Mr. Nanis LTD benefits on June 30, 2003, was made on the basis of Residual Disability. This conclusion was drawn by determining that Mr. Nanis could perform the substantial and material duties of his occupation without restriction, these duties being answering the phone, ringing the cash register, and taking orders. While it is our contention that the determination of Mr. Nanis' claim falls under Own Occupation Total Disability, as explained above, Mr. Nanis' condition has reached the point where he is even incapable of performing these ancillary duties. Mr. Nanis' condition of Epicondylitis has deteriorated to the point where Mr. Nanis experiences great pain when lifting a coffee cup, shaking hands, or grasping a pen. Therefore, tasks such as writing, typing, ringing a cash register, and dialing and picking up a phone, are all tasks that would cause Mr. Nanis pain, especially when repeated in one day.

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 32

    D.    **Due To His Condition, Mr. Nanis is Currently Receiving Appropriate Care And Treatment From A Physician On A Continuing Basis.**

        1.    **Policy Definition**

Mr. Nanis' Policy defines "Physician's Care" as "treatment by a physician which is appropriate for the condition causing the disability. When in the opinion of the Physician future and continued treatment would be of no benefit to You, then the requirement of being under a Physician's Care will be considered to be met."

        2.    **Evidence That Mr. Nanis Is Receiving Appropriate Care And Treatment From A Physician On A Continuing Basis**

Mr. Nanis has been receiving continuous care and treatment for his condition of Epicondylitis. This care and treatment includes the following:

- Receiving medical care from a Doctor on a continuous basis (i.e. physical therapist, primary care physician, orthopedic surgeon)

- Receiving care that is necessary to meet his basic health needs and are of demonstrable medical value (i.e. anti-inflammatory medications to alleviate his pain, physical therapy exercises to perform at home)

- Receiving care that is consistent in type, frequency and duration of treatment with relevant guidelines of national, medical, research and health care coverage organizations and governmental agencies (i.e. regular visits to a primary care physician)

- Receiving care that is consistent with his diagnosis; and

- Receiving care with the purpose of maximizing his medical improvement (the goal has consistently been to alleviate Mr. Nanis' pain as much as possible. Dr. Jones has prescribed medications, physical therapy and cortisone injections to minimize Mr. Nanis' pain)

VI.    **THE LAW**

An insurer has a legal duty to claimants to "effect prompt, fair and equitable settlement of claims," G.L. c. 176D, §3(9)(f), and a claimant may recover damages from an insurer for a failure to do so. G.L. c. 93A, §9(1). Upon the basis of information already in the possession of MetLife, MetLife has engaged in the unfair practice in the business of insurance by failing to

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 33

effectuate a prompt, fair and equitable settlement of Mr. Nanis' claim. As a direct result of such an unfair practice, Mr. Nanis has been adversely affected by not having his claims settled promptly and equitably.

Metlife has committed numerous unfair and deceptive acts or practices defined by 93A, § 2(a), in failing to provide Mr. Nanis with the LTD benefits to which he is entitled as a result of disability due to his physical illness.

The above actions on the part of MetLife also constitute violations of M.G.L. c. 176D, sec. 3(9), and specifically violations of the following sections of that chapter:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(f) Failing to effectuate prompt, fair and equitable settlement claims in which liability has become reasonably clear; and

(l) Failing to settle claims promptly, where liability has become reasonably clear.

Please consider this letter a thirty-day demand letter under M.G.L. ch. 93A, § 9, for full payment of Mr. Nanis' disability benefits, including back benefits from November 2002 to the present. Demand is further made upon MetLife to pay Mr. Nanis 12% interest on Mr. Nanis' back benefits. Demand is also made upon MetLife to reimburse Mr. Nanis for $15,000 in attorneys' fees and costs expended in pursuing this action to date and $30,000 for the mental and emotional distress inflicted upon him as a result of the conduct employed by MetLife, its agents, servants, and/or employees in handling his claim. MetLife has clearly violated its fiduciary duty to Mr. Nanis. It promised Mr. Nanis financial security when it sold him his Policy. Instead, MetLife treated Mr. Nanis as though he were no more than a malingerer, seeking to benefit when he was not entitled. Mr. Nanis is a man of integrity. Mr. Nanis was accustomed to working full-

Mr. Robert Benmosche & Mr. Jay Purves
March 24, 2004
Page 34

time and was hesitant to cease work. Unfortunately, his condition left him with no choice but to cease working full-time because he was physically unable to do so. Under the terms of his Policy, Mr. Nanis is due LTD benefits until his disability ceases. MetLife should immediately grant his benefits, reinstate his rights under his Policy and remit payment of denied past benefits.

Pursuant to the Consumer Protection Act, if MetLife, after trial, is found to have violated either the Consumer Protection Act or 176D, then it may be liable for multiple damages, interest and attorneys' fees and costs.

Under 93A, § 9(3), MetLife has thirty (30) days from the receipt of this written demand to make a written tender of settlement. I am available to discuss a reasonable settlement of Mr. Nanis' claims during the next thirty days.

Very truly yours,

Mala M. Rafik

Enclosures
cc:   George Nanis (via first class mail)