**UNITED DISTRICT COURT**
**DISTRICT OF MASSACHSETTS**

| | |
|---|---|
| GEORGE NANIS,<br><br>Plaintiff<br><br>V.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>Defendant | CIVIL ACTION NO. 04-40200 |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**
**NATURE OF THIS ACTION**

1.  Plaintiff, George Nanis ("Mr. Nanis" or "Plaintiff"), brings this action against the Defendants, Metropolitan Life Insurance Company ("MetLife") and Lincoln National Life Insurance Company ("Lincoln National"), for violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, and the Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Act, M.G.L. c. 176D and for breach of contract. MetLife has engaged in unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A, §§ 2 and 9, and unfair or deceptive acts or practices in the business of insurance within the meaning of 176D by denying Mr. Nanis, in bad faith, the long-term disability ("LTD") benefits he is owed under his individual disability income Policy ("Policy"), owned and administered by the Defendant. MetLife denied Mr.

1

      Nanis' claim for disability income benefits despite uncontroverted medical evidence from Mr. Nanis' treating physicians establishing the existence of Mr. Nanis' total disability due to Epicondylitis.

2. Specifically, MetLife has: misrepresented the benefits, advantages, conditions and terms of its Policy in violation of M.G.L. c. 176D § 3(1)(a); and has engaged in unfair settlement practices in violation of M.G.L. c. 176D, § 3(9)(a),(b),(d),(f), by misrepresenting pertinent facts of insurance policy provisions relating to coverages at issue, failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies, refusing to pay claims without conducting a reasonable investigation based upon all available information, and failing to effectuate a prompt, fair and equitable settlement of Mr. Nanis' claim once its liability for his claim became reasonably clear.

**PARTIES**

3. Mr. Nanis is a 47 year-old individual residing at 7 Phillips Street, Westboro, Massachusetts. Mr. Nanis is a vested participant in the Policy.

4. The Defendant Metropolitan Insurance Company is a for-profit corporation with its principal place of business at One Madison Avenue, New York, New York, 10010. MetLife transacts business in Massachusetts and is responsible for administering the Policy in question.

5. The Defendant Lincoln National Life Insurance Company is a for-profit corporation with its principal place of business at 200 East Berry Street, Fort Wayne, Indiana 46901. Lincoln National transacts business in Massachusetts and

is responsible for issuing the Policy in question.

6.  The Policy under which the Plaintiff is suing is an individual "long term disability policy" owned and administered by MetLife. The Policy Number is 156086664.

## STATEMENT OF FACTS

**Insurance Entitlement; Definition of Disability; Length of Coverage**

7.  In February 1991, at the age of 33, Mr. Nanis purchased his individual policy from Lincoln National Life Insurance Company. Mr. Nanis' Policy was later purchased by MetLife. (**See** **Exhibit A**, attached hereto.) Mr. Nanis' monthly premium at the time he purchased his Policy was $44.72 monthly or $514.99 annually.

8.  Mr. Nanis is covered for Total Disability under his Policy for his lifetime.

9.  Mr. Nanis purchased his Policy not because he expected to be disabled, but like many individuals, wanted the security of such a policy in the event that he was to suffer a debilitating illness.

10. From the time he purchased the Policy until the present, Mr. Nanis has believed that if he were to become residually and/or totally disabled, the Policy would supplement his loss of income.

11. The Policy provides for the payment of LTD benefits when an insured person becomes "totally disabled." Under the "Definitions" section of the Policy, "Own Occupation Total Disability" is defined as follows:

> "Own Occupation Total Disability" means that due to Injuries or Sickness:
>
> a.  You cannot do the main duties of Your Occupation; and

        b.      You are under a Physician's Care.

12. The Policy defines "Occupation" as "the occupation (or occupations, if more than one) in which You are engaged at the start of Your disability."

13. The Policy defines "Injury" as "an accidental bodily injury that happens while this Policy is in force.

14. Mr. Nanis' monthly benefit for Total Disability is: $1800.00.

15. Except for the definitions of "total disability" quoted in this Complaint, the Policy contains no other definition or explanation of these terms. In addition, the Policy does not specifically require a certain type of evidence to prove the existence of a disability.

**Mr. Nanis' Claim**

16. Mr. Nanis has presented a timely claim to the Defendants asserting that he is an insured person, that he became totally disabled while insured, and that he is entitled under the Policy to full LTD benefits for the period of time beginning November 2002, and continuing thereafter without interruption through the present, and continuing in the future for the remainder of his lifetime or until he is no longer disabled.

**Mr. Nanis' Business – The Submarina**

17. In April 1992, Mr. Nanis opened the Submarina, a pizza and sub shop in West Brookfield, Massachusetts.

18. Before opening the Submarina, Mr. Nanis worked at various companies in the field of financial advising. Mr. Nanis left this field to pursue his own business.

19. Mr. Nanis originally purchased the Submarina with a partner. However, in 1994,

      Mr. Nanis bought his partner's share of the business to become the sole owner of the Submarina. Mr. Nanis operated the Submarina on his own at first, but later hired part-time employees as the demands and the clientele of the business increased.

20. Mr. Nanis served as owner and operator of the Submarina. Mr. Nanis' chief responsibility was food preparation and baking.

21. Mr. Nanis worked at the Submarina full-time, often working 90 hours in one week to meet the Submarina's demands.

22. Mr. Nanis' duties at the Submarina were almost entirely labor-intensive. As Mr. Nanis stated in his application for LTD benefits, dated December 12, 2002, he spent approximately 12 hours each week "picking up supplies," 35 hours each week with "food prep and cooking," 12 hours "cleaning equipment and store," 20 hours kneeding (sic) and mixing dough and prep," and 4 hours of "office paperwork/banking." Mr. Nanis also stated that he used his "arms and hands" to perform these tasks.

**Onset of Mr. Nanis' Illness and Subsequent Disability**

23. In 1999, Mr. Nanis began to feel intense pain in his elbow. Mr. Nanis worked despite this pain until the summer of 2002, when the pain became intolerable and affected Mr. Nanis' ability to work at the Submarina.

24. On September 18, 2002, Mr. Nanis saw Dr. Jeffrey Jones, his primary care physician, regarding the increasing pain in his elbow. Dr. Jones diagnosed Mr. Nanis with Lateral Epicondylitis. Dr. Jones advised Mr. Nanis at that time to take time off from work. Specifically, Dr. Jones recommended that Mr. Nanis take

two weeks off from work to rest his elbow.

25. Despite Dr. Jones' advice, Mr. Nanis was only able to leave the Submarina for four or five days due to the demands of the business.

26. From September 2002 through September 2003, Mr. Nanis worked at the Submarina despite his pain. However, from September 2002 to September 2003, Mr. Nanis was unable to prepare food, retrieve supplies, and bake, which were the primary functions of his occupation. In order for the Submarina to stay in business, Mr. Nanis hired more employees and maintained his administrative tasks which consisted of talking to customers, taking orders, and supervision of his employees.

27. On occasion, Mr. Nanis would have to assist his employees with tasks that his doctors had advised him to avoid if the Submarina became overly busy and his employees could not handle the workload. When Mr. Nanis was forced into this role, he would be in severe pain for days.

**Exacerbation of Symptoms Due to Continued Work:**

28. Between September 2002 and 2003, Mr. Nanis' condition progressed to the point that tasks that once were simple for Mr. Nanis to perform became arduous or impossible altogether. For example, Mr. Nanis had a difficult time putting his coat on every day. He was unable to a key on a key ring or to open a bag of potato chips. Mr. Nanis had a difficult time pressing the buttons on a TV remote control. It was impossible for Mr. Nanis to clean snow or ice off his car in the winter, snow blow, or shovel. He was unable help his widowed mother with her housework or to take his dog for a walk. Mr. Nanis even had a difficult time

holding a pen, a cup of coffee, or a razor for shaving.

29. In September 2003, Mr. Nanis relinquished control of the Submarina, as he was no longer able to perform the duties of his occupation. As of September 2003, Mr. Nanis could only perform approximately 5% of his duties at the Submarina.

30. From September 2003 to the present, Mr. Nanis has continued to experience pain in his arms and elbows which disables him from performing many tasks of daily living.

**Mr. Nanis' Application for Benefits Under His Policy**

31. On December 12, 2002, Mr. Nanis applied for LTD benefits under his Policy. Mr. Nanis claimed disability commencing on November 1, 2002, due to his condition of Epicondylitis.

32. In Dr. Jones' Attending Physician's Statement ("APS"), submitted as a part of Mr. Nanis' application for benefits, Dr. Jones indicated that Mr. Nanis was diagnosed with Lateral Epicondylitis. He also stated that Mr. Nanis' subjective symptoms were elbow and forearm pain and that his objective finding was "tenderness at lateral epicondyle, worse with wrist extension."

33. Dr. Jones further stated in his APS that Mr. Nanis was unable to use his arms because of the pain he experienced. Dr. Jones indicated that treatment for Ms. Nanis' pain consisted of work limitation/rest, steroid injections by orthopedist, physical therapy and acupuncture.

34. On February 7, 2003, Mr. Jay Purves of MetLife contacted Mr. Nanis regarding his claim for total disability. At that time, Mr. Nanis informed Mr. Purves that he was still answering phone calls, taking orders, and opening the cash register at the

Submarina.

35. On February 14, 2003, Mr. Nanis received a letter from Mr. Purves informing Mr. Nanis that his claim would be more appropriate for Residual Disability under the Policy rather than Total Disability, as he was still engaging in some of the duties of his occupation. Mr. Purves further stated in his letter that Mr. Nanis' claim would be re-examined after receipt and review of medical records and financial information.

36. Mr. Nanis received a subsequent letter from Mr. Purves dated April 21, 2003, which requested financial information to determine his monthly earnings.

37. In response to Mr. Purves April 21, 2003 letter, Mr. Nanis provided MetLife with all of the documents requested by MetLife.

**MetLife's Denial of Mr. Nanis' Claim for LTD Benefits:**

38. On June 30, 2003, six months after Mr. Nanis filed his application for benefits, Mr. Purves wrote Mr. Nanis informing him that his claim had been denied by MetLife. Mr. Purves stated that Mr. Nanis' condition of Epicondylitis was generally not a condition that resulted in functional impairment for the use of the hands and the arms. Mr. Purves added that, "we have also monitored your activities and you have exhibited the ability to perform the substantial and material duties of Your occupation without restriction."

39. MetLife's denial of Mr. Nanis' claim was evaluated under the incorrect definition of total disability.

**Mr. Nanis' Appeal of MetLife's Denial; Request for Claim File**

40. In July 2003, Mr. Nanis retained legal representation in order to appeal MetLife's

8

denial of Mr. Nanis' LTD benefits.

41. On July 19, 2003, Mr. Nanis' counsel sent MetLife a written request for Mr. Nanis' claim file.

42. On July 23, 2002, MetLife wrote counsel for Mr. Nanis indicating that it was not MetLife's policy to release such information.

43. On July 28, 2003, September 2, 2003, and October 28, 2003, Mr. Nanis' counsel repeatedly requested Mr. Nanis' claim file.

44. MetLife responded to counsel for Mr. Nanis' request for Mr. Nanis' claim file on August 22, 2003, September 17, 2003, and December 19, 2003, stating that MetLife was in receipt of counsel's letters and would prepare a more detailed response to Mr. Nanis' request.

45. On January 15, 2004, MetLife informed Mr. Nanis that because Mr. Nanis' policy is not governed by the Employment Retirement Income Security Act of 1974 (ERISA), disclosure of Mr. Nanis' claim file was not mandated by law

## 93A Demand Letter

46. On March 24, 2004, counsel for Ms. Nanis sent Robert Benmosche, President and Chief Executive Officer of MetLife Life Insurance Company, and Jay Purves, Disability Claims Specialist of MetLife, via certified mail, return receipt requested, postage prepaid, a written demand for relief pursuant to M.G.L. c. 93A, § 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered ("93A Demand Letter"). (**See Exhibit B.**, without exhibits.)

47. The 93A Demand Letter demanded full payment of Mr. Nanis' disability benefits,

including back benefits from November 2002 to the present. Demand was further made upon MetLife to reimburse Mr. Nanis 12% interest on Mr. Nanis' back benefits. Counsel for Mr. Nanis also made a demand of MetLife to reimburse Mr. Nanis for $15,000 in attorneys' fees and costs expended in pursuing the action and $30,000 for the mental and emotional distress inflicted upon Mr. Nanis as a result of the conduct employed by MetLife.

48. Through the 93A Demand Letter, Mr. Nanis' counsel notified Mr. Benmosche and Mr. Purves that MetLife could be liable for multiple damages, interest, attorneys' fees and costs if they are found after trial to have violated either 93A or 176D.

49. As a part of this 93A Demand Letter, Mr. Nanis included updated medical information and numerous affidavits from co-workers, family, friends, and his treating physicians regarding his restrictions, limitations and total disability under the terms of his Policy.

50. Mr. Nanis received MetLife's response to his 93A Demand Letter on April 23, 2004. MetLife's April 23, 2004 response dismissed the evidence submitted by Mr. Nanis in support of his claim and issued a perfunctory denial of Mr. Nanis' claim for benefits.

51. MetLife's April 23, 2004 denial again evaluated Mr. Nanis' claim under the incorrect policy definition of total disability.

**Damages**

52. Due to the unlawful denial of benefits under M.G.L. 93A and M.G.L. 176D, Mr. Nanis has lost his rightful LTD benefits, for which he has paid his premiums since

      1991.  Mr. Nanis continues to pay his premium payments to MetLife, in the amount of approximately $65.00 a month.

53. While Mr. Nanis' financial condition has stabilized, MetLife's initial denial of his claim and the withholding of his disability benefits exacerbated the symptoms of Mr. Nanis' illness, causing increased anxiety.  Mr. Nanis' increase in symptoms slowed his progress and further inhibited his return to work.

54. MetLife's unjust and wrongful withholding of funds and unreasonable and bad faith claims procedures have caused Mr. Nanis severe emotional distress, including but not limited to anxiety, stress, and humiliation over the loss of his business.

## FIRST CAUSE OF ACTION

### (Violation of M.G.L. c. 93A §§ 2 & 9)
### (Metropolitan Life Insurance Company)

55. Mr. Nanis realleges each of the paragraphs above as if fully set forth herein.

56. Mr. Nanis' first claim is for violation of M.G.L. c. 93A §§ 2 and 9 and M.G.L. c. 176D.

57. At all times relevant times hereto, MetLife was engaged in trade or commerce.

58. MetLife has committed acts and followed practices in respect to its investigation and inquiry into Mr. Nanis' claim for benefits, which constitute unfair and deceptive acts and practices in the conduct of a trade or commerce as prohibited by M.G.L. c. 93A.

59. MetLife has committed acts and followed practices in respect to Mr. Nanis, which constitute unfair and deceptive acts and practices in the conduct of a trade or commerce as prohibited by M.G.L. c. 93A, §§ 2, and 9 .

60. MetLife has committed numerous unfair and deceptive acts and practices in the business of insurance, against Mr. Nanis, in violation of M.G.L. c. 176D, §§ 2, and 3.

61. MetLife's violations of M.G.L. c. 176D constitute violations of M.G.L. c. 93A.

62. The aforesaid acts and practices of MetLife were willful and knowing.

63. MetLife's unfair and deceptive acts and practices caused Mr. Nanis to suffer significant financial loss and severe emotional distress

### SECOND CAUSE OF ACTION
### (Breach of Contract)
### (All Defendants)

64. Mr. Nanis realleges each of the paragraphs above as if fully set forth herein.

65. Mr. Nanis' second claim is for breach of contract.

66. Mr. Nanis entered into a valid contract with MetLife for the provision of long-term disability insurance, in the event that he required such insurance.

67. Mr. Nanis fulfilled the terms of the contract by remitting premium payments on an annual basis, as required by the Defendants under the terms of the Policy.

68. Mr. Nanis further met all of the conditions for the payment of disability insurance benefits under his Policy, including but not limited to, providing MetLife proof of his total disability under the terms of the insurance contract. Nonetheless, the Defendants have failed to provide Mr. Nanis with the benefits he is due under the terms of the contract.

69. The Defendants, by denying Mr. Nanis' claim despite the voluminous evidence supporting Mr. Nanis' total disability under the Policy, have breached its duties and obligations under its contract with Mr. Nanis, resulting in monetary injury to

Mr. Nanis.

70. Mr. Nanis has been damaged by reason of the Defendants' breach of contract and is entitled to recover from the Defendants his past and future disability benefits, as well as a reimbursement of premiums paid under the Policy.

### THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (All Defendants)

71. Mr. Nanis realleges each of the paragraphs above as if fully set forth herein.

72. The Defendants breached the implied covenant of good faith and fair dealing by failing to act in good faith when making determinations regarding Mr. Nanis' claim for disability benefits.

73. As a direct and foreseeable consequence of said breach, Mr. Nanis has been damaged.

### PRAYER FOR RELIEF

WHEREFORE, George Nanis, requests this Court to:

(1) Enter judgment for Mr. Nanis against the Defendants;

(2) Declare, adjudge, and decree that the Defendants are obligated to pay Mr. Nanis for past and ongoing disability benefits as calculated under the terms of the Policy.

(3) Declare, adjudge, and decree that the Defendants are obligated to pay Mr. Nanis the premium payments he has remitted since he has become disabled.

(4) Allow actual damages;

(5) Allow multiple damages;

(6)  Award interest, costs, and attorneys' fees to Mr. Nanis; and

(7)  Award such other relief as this Court deems just and proper.

Respectfully submitted,

GEORGE NANIS
By his attorneys,

/s/ Mala M. Rafik
S. Stephen Rosenfeld
BBO No. 428940
Mala M. Rafik
BBO No. 638075
ROSENFELD & RAFIK, P.C.
44 School Street, Suite 410
Boston, MA 02108
(617) 723-7470

Date: January 6, 2005

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 6th day of January, 2005, one copy of the above document was delivered via electronic mail and first class mail, to:

James Ciapciak, Esq.
Ciapciak & Associates, P.C.
99 Access Road
Norwood, MA  02062

/s/ Mala M. Rafik
Mala M. Rafik, Esq.